## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

**GLADYS M. CORDOVES**,

      Plaintiff,

v.

**MIAMI-DADE COUNTY**, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendants, Mydatt Services, Inc. d/b/a Valor Security Services ("Valor"); SDG Dadeland Associates, Inc. d/b/a Dadeland Mall ("Dadeland"); Officer Jean R. Pompee ("Pompee"); and Miami-Dade County's (the "County['s]") (collectively, "Defendants[']") Motion for Summary Judgment [ECF No. 95] and Combined Memorandum in Support . . . ("Motion") [ECF No. 95-1], both filed December 17, 2014.   In the Motion, Defendants seek summary judgment on all claims asserted by Plaintiff, Gladys Cordoves ("Cordoves"), in the Third Amended Complaint ("TAC") [ECF No. 52], filed July 31, 2014. The Court has carefully reviewed the Motion; Cordoves's Response . . . ("Response") [ECF Nos. 109, 109-1], filed January 19, 2015; Cordoves's Supplemental Response . . . ("Supplemental Response") [ECF No. 122], filed January 26, 2015; Defendants' Reply . . . ("Reply") [ECF No. 123], filed January 29, 2015; the record; and applicable law.

### I.  BACKGROUND

This case arises out of an incident at the Dadeland Mall on November 14, 2010, during which Cordoves had a confrontation with security personnel that ended with her arrest.  The

incident was precipitated by the presence of Shiloh, a small dog Cordoves was toting in a stroller while shopping with her mother and daughter.  The following facts — many of which are disputed — are construed in the light most favorable to Cordoves, the non-moving party.

### A. Shiloh

Cordoves suffers from post-traumatic stress disorder ("PTSD"), a psychiatric condition that causes her to experience, among other symptoms, severe panic attacks.  (*See* Cordoves's Statement of Material Facts ("Pl. SMF") ¶¶ 111–12 [ECF No. 109]).  Her PTSD was induced by an automobile accident in 1999: Cordoves was in a car with her daughter, Barbara Cordoves ("Barbara"), when an automobile attached to a tractor-trailer in front of them broke loose from its moorings and crashed down onto the hood of Cordoves's car, trapping her inside.  (*See id.* ¶¶ 110–11).  Cordoves has been seeing psychiatrists to help her cope with her PTSD, but her panic attacks still sometimes require hospitalization, and she has been unable to work.  (*See id.* ¶¶ 112, 114–15).

In 2007, Cordoves began psychiatric treatment with Dr. Cuervo, who diagnosed Cordoves with PTSD, severe panic disorder, and major depression recurrent.  (*See id.* ¶¶ 115–16).  According to Cordoves, on May 4, 2009, Dr. Cuervo recommended she get a service dog to help her cope with her PTSD and depression.  (*See id.* ¶ 117).  Cordoves and her daughter Barbara then spent about seven months looking for a dog.  (*See id.* ¶¶ 118–19).  Barbara contacted organizations that bred and trained service dogs, but the organizations had long waiting lists, and their services were expensive.  (*See* May 28, 2014 Deposition of Barbara Cordoves ("Barbara 5/28/14 Dep.") 105:2–18 [ECF No. 95-11]).  Cordoves and Barbara therefore decided to purchase and train a dog on their own.  (*See id.*).  They searched pet stores looking for an appropriate dog, but all of the dogs they found were too playful and did not have

the right temperament.  (*See id.* 105:22–106:12).

On December 13, 2009, at a pet store called Cute Puppies, Cordoves purchased Shiloh, a white toy poodle, because "there was an immediate connection and bond between" them.  (Pl. SMF ¶¶ 119–20).  Shiloh was ten weeks old, with no prior training other than potty training. (*See id.* ¶ 20; Defendants' . . . Statement of Material Facts ("Defs. SMF") ¶ 19 [ECF No. 95-2]). Despite his lack of prior training, from the very beginning of their relationship, Shiloh could detect the onset of panic attacks in Cordoves.  (*See* Pl. SMF ¶ 121).  Over the next several months, Barbara trained Shiloh at home[1] to perform his "alert" task in response to Cordoves's panic attacks.  (*See id.* ¶ 122).

Whether Shiloh is next to Cordoves, on the floor, in a stroller, or even in another room, once he detects an impending panic attack, he runs over to Cordoves, jumps onto her lap, and applies a pressurized, massage-like licking pattern to the left side of her body.  (*See id.*; Cordoves 11/7/14 Dep. 18:17–25, 193:21–24; June 11, 2014 Deposition of Barbara Cordoves ("Barbara 6/11/14 Dep.") 12:20–13:14, 17:8–18 [ECF No. 95-10]; Barbara 5/28/14 Dep. 72:4– 18).  He also paws on Cordoves, nudges her chin, and yelps to get the attention of Barbara.  (*See* Barbara 6/11/14 Dep. 17:8–18; Barbara 5/28/14 Dep. 72:4–10).  Cordoves claims Shiloh's alerts minimize or alleviate her panic attacks, which have decreased in frequency and severity ever since Shiloh became part of her life.  (*See* Cordoves 11/7/14 Dep. 15:13–14; Barbara 5/28/14 Dep. 68:20–24, 70:16–22).

**B.  Dadeland Mall**

The following facts are relevant to Cordoves's 42 U.S.C. section 1983 claim and therefore, unless otherwise noted, are Cordoves's version of the facts.  *See Jones v. City of*

---

[1] Cordoves also took Shiloh to obedience training classes at PetSmart and Breedmasters to learn basic commands, such as to sit and stay.  (*See* Defs. SMF ¶¶ 24, 26; November 7, 2014 Deposition of Gladys Cordoves ("Cordoves 11/7/14 Dep.") 170:17–21 [ECF No. 95-6]).

*Dothan, Alabama*, 121 F.3d 1456, 1458 n.2 (11th Cir. 1997) ("For the present purposes, we state the facts in the light most favorable to the [plaintiffs]. This being so, they may not be the actual facts." (alteration added; citation omitted)). Further, any facts supplied by Defendants that Cordoves did not controvert with evidence are deemed admitted. *See* FED. R. CIV. P. 56(e)(4); S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required . . . will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record.").

### 1. Encounter with Caminero

On November 14, 2010, Cordoves, Barbara, and Cordoves's mother went to Dadeland Mall[2] and brought Shiloh along in a stroller. (*See* Pl. SMF ¶ 130; Defs. SMF ¶ 34). After entering the mall through JCPenney — outside of which they had parked their car — they headed to the food court to grab a bite to eat. (*See* Pl. SMF ¶¶ 132–33). Cordoves took a seat at a table with Shiloh and her mother, and Barbara went to Johnny Rockets to order some food. (*See id.* ¶¶ 133–34). While Barbara was away, security guard Alex Caminero ("Caminero"), an employee of Valor,[3] approached Cordoves and told her she had to leave the mall because pets were not allowed. (*See id.* ¶ 137). Cordoves responded that Shiloh is a service dog, but Caminero ignored her and again demanded she leave the mall. (*See id.* ¶ 138).

At that point, Barbara approached and asked Caminero what the problem was. (*See id.* ¶ 139). Caminero again explained pets were not allowed in the mall. (*See id.* ¶ 140). He then led Barbara to a nearby sign, which stated no pets were allowed. (*See id.* ¶¶ 140–41). According to Cordoves, the sign did not indicate any exception for service dogs. (*See id.* ¶ 141). Barbara

---

[2] Dadeland is the company that owns and operates the Dadeland Mall. (*See* Defs. SMF ¶ 1).

[3] Valor was retained by Dadeland to provide security services at Dadeland Mall. (*See id.* ¶ 2).

and Caminero returned to where Cordoves was, and Caminero again ordered them to leave the mall.  (*See id.* ¶ 142).

The parties agree Cordoves then asked to speak with Caminero's supervisor and started trying to read something on Caminero's sleeve, but Caminero kept turning away.  (*See* Defs. SMF ¶¶ 43–45).  Cordoves claims she was trying to see if Caminero had any identification displayed on his clothing, but after he kept turning away, he "spontaneously yelled out 'don't touch me' while he grabbed his clothes and pulled them to make it appear the Cordoves women had disheveled his clothing."  (Pl. SMF ¶¶ 143–44).  Defendants, in contrast, assert Cordoves got angry, "called him a monkey because 'he was from the Dominican Republic,'" and then Cordoves and Barbara "began pulling on his shirt."  (Defs. SMF ¶ 41).

At that point, Cordoves, her mother, and Barbara decided to heed Caminero's directive to leave the mall, so they headed in the direction of JCPenney, near where their car was parked. (*See* Pl. SMF ¶ 145).  As they walked away, Caminero followed them while "speaking into [his walkie-talkie] saying things that the Cordoves women could not hear."  (*Id.* ¶ 147).  A female security guard approached them and warned them to leave, but they explained they were heading to the exit where they had parked.  (*See id.* ¶ 148).  Soon enough, they were surrounded by a number of other security guards, at which point Pompee, an off-duty Miami-Dade County police officer working at the mall,[4] arrived.  (*See id.* ¶¶ 148–49).

### 2. Encounter with Pompee

Caminero told Pompee that Cordoves was not following his order to leave the mall on the basis pets were not allowed.  (*See* Defs. SMF ¶ 54).  Another security guard, Dwain Pratt, told Pompee, "we need to move them out of the Mall."  (*Id.* ¶ 57).  Pompee asked Caminero if

---

[4] Dadeland had an agreement with the County whereby Dadeland could retain the services of off-duty County police officers to provide a police presence at Dadeland Mall.  (*See id.* ¶ 3).

Caminero wanted Pompee "to arrest her (meaning Gladys Cordoves) for hitting [him]," to which Caminero responded, "yes." (Pl. SMF ¶ 150). Cordoves asked Pompee if he had seen Cordoves hit Caminero, but Pompee said he did not have to see that happen to arrest her. (*See id.* ¶ 151).

According to Cordoves, "[e]verything happened very fast." (Defs. SMF ¶ 79 (alteration added)). First, "Pompee . . . immediately grabbed forcefully and painfully on . . . Cordoves['s] right wrist." (Pl. SMF ¶ 152 (alterations added)). Then he "grabbed the left forearm area forcefully causing pain and bruising on the forearm of Ms. Cordoves." (*Id.* ¶ 153). He "then spun Ms. Cordoves around so that her back was to him. He pulled both of [her] arm[s] up against her joint causing pain and injury. He then placed her in a bear hug and began squeezing her extremely hard causing pain." (*Id.* ¶ 154 (alterations added)). Next, Pompee lifted her up and "began pulling her back in the direction of the food court." (*Id.* ¶ 155).

As Pompee carried her in his arms, with her back to him, "she began to sweat, became pale and proceeded to appear that she would pass out." (*Id.* ¶ 156). Next, "Pompee slammed Ms. Cordoves into the Godiva [Chocolatier store] window causing it to vibrate" (*id.* ¶ 157 (alteration added)), but the glass did not shatter, nor was Cordoves cut (*see* Defs. SMF ¶ 82). Cordoves then told Pompee "she was disabled, that she was not feeling well" (Pl. SMF ¶ 158), but she never told him what her disability was (*see* Defs. SMF ¶ 83). With her back still turned to him so that he could not see her face, he squeezed her again. (*See id.* ¶¶ 90–91). "Cordoves then lost consciousness, became limp in Officer Pompee's arms and Officer Pompee then threw her to the floor." (Pl. SMF ¶ 159). She "hit her head when she fell and was unable to move." (*Id.* ¶ 160). Cordoves claims she "never resisted" Pompee during this encounter. (*Id.* ¶ 71).

Pompee used no other force on Cordoves. (*See* Defs. SMF ¶ 102). He also was never able to place her in handcuffs. (*See id.* ¶ 101). Cordoves was taken away by an ambulance and

treated at a hospital, where she was identified as having "a contusion to the head and Anxiety Reaction." (Pl. SMF ¶¶ 164, 168). A few officers met her there, and she signed a notice to appear without having to serve any jail time. (*See id.* ¶ 167; Defs. SMF ¶ 107). The next day, Cordoves checked herself into an emergency room because she was still in pain. (*See* Pl. SMF ¶ 169). The hospital found she "was suffering from a chest contusion, head contusion, two contusions of the left forearm and a contusion on her right thigh." (*Id.*). Since then, Cordoves has seen a doctor and an orthopedic surgeon for continued treatment, including surgery, for lasting injuries and pain resulting from the incident at the mall. (*See id.* ¶¶ 172–78).

Cordoves was charged with disorderly conduct, battery, resisting arrest without violence, and trespass. (*See id.* ¶ 170). On April 5, 2011, a bench trial was held in state court, following which all charges against Cordoves were dismissed. (*See id.* ¶ 171).

### C. Cordoves's Third Amended Complaint

In Count I of the Third Amended Complaint, Cordoves seeks damages from Pompee under section 1983, claiming Pompee employed excessive force when he arrested her, violating her rights under the Fourth Amendment to the U.S. Constitution. (*See* TAC ¶¶ 41–44). In Count II, a related state-law claim, Cordoves seeks damages against the County for assault and battery on the theory the County is vicariously liable for Pompee's acts pursuant to Florida Statute section 768.28. (*See id.* ¶¶ 45–50). Count VII is a derivative claim against Dadeland and Valor, seeking to hold them liable under section 1983 for acting in concert with Pompee. (*See id.* ¶¶ 89–93).

In Count V, Cordoves alleges Dadeland discriminated against her in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. section 12181 *et seq.*, which she argues required Dadeland to accommodate her disability by permitting the presence of Shiloh,

CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

which she asserts is a service dog.  (*See* TAC ¶¶ 59–79).  Counts VI and VIII, related state-law claims, allege Dadeland and Valor, respectively, are liable for negligent supervision and security in connection with Caminero's actions.  (*See id.* ¶¶ 80–88, 94–101).  Counts III and IV, also state-law claims, allege Valor and Dadeland, respectively, are liable for false imprisonment in connection with Caminero and the other security guards' alleged restraint of Cordoves's movement during the incident.  (*See id.* ¶¶ 51–58).  Defendants seek summary judgment on all counts of the Third Amended Complaint.  (*See generally* Mot.).

## II.  LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a), (c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. July 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations and internal quotation marks omitted)).  "[T]he plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex*, 477 U.S. at 322 (alterations and internal quotation marks omitted)).

Nevertheless, "factual disputes do not preclude a grant of summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions.  Thus, in the context of a § 1983 case, summary judgment would be appropriate as a matter of law, notwithstanding factual disputes on the record regarding the defendant's conduct."  *Rich v. Dollar*, 841 F.2d 1558, 1564–65 (11th Cir. 1988).  However, "if the legal norms allegedly violated were as a matter of law clearly established at the appropriate time, a genuine fact issue as to what conduct the defendant engaged in would preclude a grant of summary judgment based upon qualified immunity."  *Id.* at 1565.

### III.  ANALYSIS

Defendants contend Cordoves's claims "are legally and factually untenable" and therefore summary judgment is warranted.  (Mot. 3).  Defendants argue the ADA claim against Dadeland fails because Shiloh is indisputably not a service animal.  (*See id.* 15–16).  Defendants

next argue that because Shiloh is not a service animal, the false imprisonment and negligence claims also fail.  (*See id.* 16–18). According to Cordoves, there is enough evidence to show a genuine issue of fact regarding Shiloh's status as a service animal, so summary judgment is not proper as to the ADA, false imprisonment, and negligence claims.  (*See* Resp. 40–47; Suppl. Resp. 1–2).  Cordoves further counters even if Shiloh is not a service dog, the false imprisonment and negligence claims stand because there still exist genuine disputes about the reasonableness of Dadeland and Valor's actions.  (*See* Resp. 47–48; Suppl. Resp. 2–3).

With respect to the section 1983 claim against Pompee, Defendants claim Cordoves has failed to abrogate Pompee's qualified immunity, as the force he used was *de minimis* and, even assuming Pompee used excessive force, he would not have been on notice he was violating Cordoves's clearly established rights.  (*See* Mot. 18–28).  Defendants also argue because Pompee's force was not clearly excessive, the battery claim against the County fails (*see id.* 28–30), as do the concert-of-action claims against Dadeland and Valor (*see id.* 30).  In response, Cordoves asserts Pompee is not entitled to qualified immunity because he was on notice his actions constituted excessive force under the Fourth Amendment.  (*See* Resp. 51–55).  Cordoves argues summary judgment on the battery claim against the County also is not proper, again because Pompee used excessive force.  (*See id.* 55–56).  Cordoves does not respond to Defendants' argument regarding the concert-of-action claims against Dadeland and Valor.

### A. The ADA Claim

Defendants maintain Cordoves cannot prove Shiloh is a service animal under the ADA and so summary judgment on the ADA discrimination claim is proper.  (*See* Mot. 13). According to Defendants, there is no evidence of any tasks Shiloh does to help Cordoves with her PTSD, nor is there evidence Shiloh received any individual training to be a service animal.

(*See id.* 15–16).   Yet viewing the evidence in the light most favorable to Cordoves, the Court finds Cordoves has proffered sufficient evidence to create a genuine dispute of fact regarding Shiloh's status as a service animal.

### 1. Service Animals Under the ADA

Title III of the ADA prohibits discrimination against individuals with disabilities in places of public accommodation, such as malls.[5]   *See* 42 U.S.C. §§ 12181(7)(E), 12182.   To implement this generic prohibition, Congress delegated authority to the Attorney General to promulgate regulations setting more specific standards of compliance with the ADA.   *See id.* § 12186(b).   Title III does not explicitly address service animals, but given the important role played by service animals to individuals who need them, the Attorney General promulgated regulations requiring places of public accommodation to allow "[i]ndividuals with disabilities . . . to be accompanied by their service animals in all areas . . . where members of the public, program participants, clients, customers, patrons, or invitees, as relevant, are allowed to go."  28 C.F.R. § 36.302(c)(7) (alterations added).   A "service animal" is defined as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability."  *Id.* § 36.104.   The regulation further provides the work or tasks performed by the dog "must be directly related to the individual's disability," and "the provision of emotional support, well-being, comfort, or companionship do[es] not constitute work or tasks for the purposes of this definition."  *Id.* (alteration added).

Generally, a "plaintiff alleging Title III ADA discrimination must initially prove that (1) he is a disabled individual; (2) the defendants own, lease, or operate a place of public accommodation; and (3) the defendants discriminated against the plaintiff within the meaning of

---

[5] The parties do not dispute the broad definition of "public accommodation" includes Dadeland Mall.  *See* 42 U.S.C. § 12181(7)(E) (defining "public accommodation" as, among other things, "a . . . clothing store, . . . shopping center, or other sales or rental establishment" (alterations added)).

CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

the ADA." *Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).  To prevail on the third prong, Cordoves must prove Dadeland discriminated against her within the meaning of the ADA by refusing to allow the presence of Shiloh at Dadeland Mall as an accommodation of Cordoves's disability.  *See* 28 C.F.R. § 36.302(c)(7). This in turn requires Cordoves to prove Shiloh is a "service animal" under 28 C.F.R. section 36.104.  *See, e.g.*, *Davis v. Ma*, 848 F. Supp. 2d 1105, 1114 (C.D. Cal. 2012); *Miller v. Ladd*, No. CV-08-05595-NJV, 2010 WL 2867808, at *4 (N.D. Cal. July 20, 2010); *Vaughn v. Rent-A-Center, Inc.*, No. 2:06-cv-1027, 2009 WL 723166, at *10 (S.D. Ohio Mar. 16, 2009). Defendants seek summary judgment on Cordoves's ADA claim on the sole ground Shiloh is not a service animal.

Courts deciding summary judgment motions on ADA claims have set a low bar for demonstrating a genuine issue of fact regarding a dog's status as a service animal.  To withstand a motion for summary judgment on the training issue, it is not necessary to proffer documented evidence of training instead of only testimony.  *See Baugher v. City of Ellensburg, WA*, No. CV-06-3026-RHW, 2007 WL 858627, at *5 (E.D. Wash. Mar. 19, 2007).  Nor is it necessary to show the dog was trained by a "certified trainer."  *Green v. Hous. Auth. of Clackamas Cnty.*, 994 F. Supp. 1253, 1256 (D. Or. 1998).  Indeed, courts have recognized a service dog may be individually trained at home.  *See Vaughn*, 2009 WL 723166, at *10; *Green*, 994 F. Supp. at 1256.  Further, "[t]here are no requirements as to the amount or type of training that a service animal must undergo, nor the type of work or assistance that a service animal must provide, but the animal be trained to perform tasks or do work for the benefit of a disabled individual."  *Rose v. Springfield-Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1214–15 (W.D. Mo. 2009); *accord Green*, 994 F. Supp. at 1256; *Vaughn*, 2009 WL 723166, at *10.  "This is not a taxing

requirement, . . . and there are no federally-mandated animal training standards." *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1256 (D. Haw. 2003) (alteration added; citation omitted).

Nevertheless, courts have granted summary judgment if a plaintiff cannot show with any specificity a genuine issue of fact regarding a dog's training or status as a service animal. For example, in *Baugher*, the court granted summary judgment on the plaintiff's ADA claim because "the record [wa]s devoid of any specific work or tasks that [plaintiff's dog] was trained to perform for the benefit of [p]laintiff." 2007 WL 858627, at *5 (alterations added). The plaintiff argued the dog cued her to take her medication and stay focused, but nothing in the record explained what specifically the dog did to cue the plaintiff or how the dog was trained to provide these cues. *See id.* Similarly, in *Rose* the court granted summary judgment because although the plaintiff described a task her pet monkey did directly relating to her disability, she provided "no explanation as to the monkey's training or the specific cues that would trigger the monkey to perform these 'tasks.'" 668 F. Supp. 2d at 1215 (citation omitted). The monkey's other tasks provided nothing more than comfort and encouragement, making the monkey "equivalent to a household pet," not a service animal. *Id.* To survive summary judgment, a plaintiff must also show the dog has already been trained to do his task and is not merely still in training. *See Davis*, 848 F. Supp. 2d at 1115 (granting summary judgment because the puppy "only had some 'basic obedience' training," and the plaintiff, who had a degenerative back disability, "was still attempting to train the puppy to assist him with walking and balancing").

### 2. Analysis

Viewing the evidence in the light most favorable to Cordoves, the Court concludes Cordoves has demonstrated a genuine dispute of fact regarding Shiloh's status as a service

animal. Defendants contend there is an "absence of any evidence establishing what tasks Shiloh was trained to perform to address [Cordoves's] PTSD" (Mot. 15 (alteration added)), but such evidence indeed exists. According to Cordoves, Shiloh detects when Cordoves is about to have a panic attack. (*See* Pl. SMF ¶ 121; Barbara 6/11/14 Dep. 12:3–4). The detection of the panic attack cues Shiloh to "alert" by jumping on Cordoves, pawing on her, nudging her chin, applying a pressurized licking massage mainly to the left side of her body, and calling Barbara over to assist. (*See* Pl. SMF ¶¶ 121–22; Barbara 5/28/14 Dep. 72:4–18; Barbara 6/11/14 Dep. 17:8–18).

Cordoves's panic attacks can be so severe as to require hospitalization (*see* Pl. SMF ¶ 112), but Shiloh's task helps Cordoves cope with her PTSD by "minimiz[ing]" or "alleviat[ing]" her panic attacks (Cordoves 11/7/14 Dep. 15:13–14 (alterations added); *see also* Barbara 6/11/14 Dep. 13:19–20 (explaining the alert has "actually brought [Cordoves's] heart rate down" (alteration added))). Cordoves's panic attacks used to be "fairly frequent," but after she purchased Shiloh, the attacks happened less frequently and were less severe when they did happen. (Barbara 5/28/14 Dep. 68:20–24, 70:16–22). Assuming Shiloh has in fact helped Cordoves cope with panic attacks that could otherwise require her hospitalization, Shiloh does more than just provide "emotional support, well-being, comfort, or companionship." 28 C.F.R. § 36.104. Contrary to Defendants' contention, a jury could find Shiloh is a service animal and not just "a 10 lb. house-pet that provided comfort to her owner." (Mot. 16).

Defendants also assert there is no evidence "Shiloh was specifically trained to perform tasks related to Gladys' disorder" (*id.*), but the evidence suggests Barbara provided this training. (*See* Pl. SMF ¶ 122; Cordoves 11/7/14 Dep. 187:25–188:6, 192:2–9, 200:14–23). Barbara stated she did research online to teach herself how to train Shiloh to help Cordoves's disability. (*See* Barbara 5/28/14 Dep. 130:24–131:6). She further stated she provided service-dog training

before the incident, between April and September 2010. (*See id.* 128:10–15). Barbara elaborated service-dog training is a continuous process: "I start with the obedience training, but with a dog, you are not going to teach everything at the same time. With the service dog, it is training, constant training, something else you are going to train him with, it takes its time." (Barbara 5/28/14 Dep. 128:19–23). Nevertheless, Cordoves and Barbara both testified Shiloh was trained to alert on the date of the incident. (*See id.* 72:19–21; Cordoves 11/7/14 Dep. 193:21–24).

Cordoves further testified Shiloh could alert even from inside his stroller, where he was during the incident. (*See id.* 18:17–25). Also, according to Barbara, Shiloh had an ability to detect and respond to panic attacks "naturally." (Barbara 6/11/14 Dep. 14:5–8). Defendants argue Cordoves's assertion Shiloh does a task naturally does not help prove Shiloh was trained to do that task. (*See* Reply 1–2). But Shiloh's predisposition to do certain tasks is relevant, as it bears on how much and what kind of individual training Shiloh required to ensure he adequately performed his alleged service task.

Defendants argue there are inconsistencies in testimony relevant to the ADA claim. For example, Defendants note "Barbara . . . testified that the only training she provided was limited to teaching the dog to climb up on her mother's lap." (Defs. SMF ¶ 30 n.1 (alteration added; citation omitted)). But then Defendants note "Barbara . . . stated that the only training she provided was 'the basic, to sit, stay.'" (*Id.* ¶ 31 (alteration added; citation omitted)). Of course, both of these claims controvert Cordoves's assertion Barbara trained Shiloh to be a service dog. And yet, inconsistencies and other credibility issues are properly considered by the jury at trial, not the Court on a motion for summary judgment. *See Liberty Lobby*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine

CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

the truth of the matter but to determine whether there is a genuine issue for trial." (alteration added)); *Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986) ("[T]he district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the jury to assess the probative value of the evidence." (alteration added; citations omitted)).  Defendants' motion for summary judgment on the ADA claim is therefore denied.

### B.  False Imprisonment Claims

Cordoves claims Valor and Dadeland falsely imprisoned her.  The Florida Supreme Court has defined false imprisonment as "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and deprivation of his liberty."  *Johnson v. Weiner*, 19 So. 2d 699, 171 (Fla. 1944).  Valor and Dadeland contend summary judgment on the false imprisonment claims is proper because Shiloh is not a service animal.  (*See* Mot. 17).  Defendants argue from this premise that, because the mall prohibited pets, and because Cordoves remained in the mall with Shiloh, Cordoves was trespassing, and therefore Valor and Dadeland's restraint of Cordoves was lawful.  (*See id.*).  As explained in Part III.A.2, *supra*, a genuine issue of fact exists regarding Shiloh's status as a service animal, and thus summary judgment is not proper on these grounds.

In what seems to be an alternative argument, Defendants contend regardless of whether Shiloh was a service dog, Cordoves's "admitted continued presence in the mall after being instructed to leave renders her a trespasser."  (Reply 3).  This argument assumes that, even if Cordoves had the right under the ADA to be at the mall with Shiloh, Dadeland could order her to leave anyway, therefore rendering her a trespasser.  It would be odd if the same facts gave Cordoves a cause of action under the ADA but also made her a criminal.  Defendants further argue "the presence of probable cause to arrest defeats any claim for false arrest or

imprisonment." (Mot. 17). As Defendants do not adequately develop the factual or legal basis for either of these arguments,[6] Defendants have not carried their burden of showing the false imprisonment claims fail as a matter of law. *See Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 1000–01 (W.D. Wash. 2012) ("Because Microsoft has failed to properly brief the issues the court must decide, the court finds that Microsoft has not carried its burden of showing an absence of material questions of fact and that it is entitled to prevail as a matter of law."); *Walden v. City of Providence*, 495 F. Supp. 2d 245, 257–58 (D.R.I. 2007) (denying summary judgment for "fail[ure] to offer developed argument about the legal significance" of the issue before the court (alteration added)). Summary judgment on the false imprisonment claims is therefore denied.

### C.  Negligence Claims

Cordoves asserts claims of negligent supervision and security against Valor and Dadeland. In the briefing, Cordoves bases her negligence claim on two separate theories. The first theory is Valor and Dadeland are negligent for failing to train their employees to comply with ADA regulations relating to service animals, which then caused Cordoves to be "expelled, assaulted, battered, injured and arrested." (Suppl. Resp. 1–2). Defendants argue this theory fails because Shiloh is not a service animal. (*See* Mot. 18). Again, as explained in Part III.A.2, *supra*, a genuine issue of fact exists regarding Shiloh's status as a service animal. Summary judgment is therefore denied as to this theory of negligence.

Cordoves's second theory is Dadeland and Valor are negligent for allowing Cordoves to

---

[6] The only cases Defendants cite to develop these arguments, *Epstein v. Toys-R-Us Delaware, Inc.*, 277 F. Supp. 2d 1266 (S.D. Fla. 2003), and *Egwuatu v. Burlington Coat Factory Warehouse Corp.*, No. 8:10-CV-996-T-33TGW, 2011 WL 2413833 (M.D. Fla. June 10, 2011), are inapposite because although they address trespass in a place of public accommodation, they do not involve a plaintiff claiming a competing right to access under the ADA. To the extent these cases stand for any broader proposition, Defendants again have not adequately developed the facts or law in support of their arguments.

be falsely imprisoned and assaulted.  (*See* Suppl. Resp. 2).  Dadeland and Valor argue this theory

fails as a matter of law.  (*See* Reply 4).  "A claim for negligence cannot be premised solely on a

defendant's alleged commission of an intentional tort."  *Brown v. J.C. Penney Corp., Inc.*, 521 F.

App'x 922, 924 (11th Cir. 2013) (citing *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d

DCA 1996)).  Assault and battery are intentional torts and therefore cannot form the sole basis of

a claim for negligence.  *See Sanders*, 672 So. 2d at 47–48.  False imprisonment is also an

intentional tort, *see Bartley v. Kim's Enter. of Orlando, Inc.*, 568 F. App'x 827, 831 (11th Cir.

2014); *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1115 (11th Cir. 2006), and

therefore cannot form the sole basis of a claim for negligence.  Accordingly, to the extent

Cordoves relies on this "intentional tort" theory of negligence, Dadeland and Valor are entitled

to summary judgment.

### D.  Section 1983 Claim

Pompee argues he is entitled to qualified immunity from the excessive force claim

asserted against him under 42 U.S.C. section 1983.  (*See* Mot. 19).  According to Pompee, the

force he used in arresting Cordoves was *de minimis* under the totality of the circumstances, and

therefore he did not violate Cordoves's Fourth Amendment right to be free from an unreasonable

search and seizure.  (*See id.*).  Further, assuming he did employ excessive force, no case law put

Pompee on notice his acts violated the Fourth Amendment.  (*See id.*).  Cordoves responds "the

record has sufficient facts to show that a constitutional violation occurred" (Resp. 53), and

furthermore, "Eleventh Circuit case law placed Pompee on notice" his actions were

unconstitutional (*id.* 54).

#### 1.  Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their

individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)). To establish the qualified immunity defense, a government official must demonstrate the acts complained of were committed within the scope of the official's discretionary authority. *See id.* at 1232. Once the official has done so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002); *see also McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

To abrogate an official's qualified immunity, a plaintiff must first show the facts, taken in the light most favorable to the plaintiff, demonstrate the official violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Sharp v. Fisher*, 532 F.3d 1180, 1183 (11th Cir. 2008); *McClish*, 483 F.3d at 1237. Even if the facts demonstrate a violation, the plaintiff has the additional burden of showing the violated constitutional right was "clearly established" at the time of the violation in order to survive summary judgment. *See Saucier*, 533 U.S. at 201; *Sharp*, 532 F.3d at 1183; *McClish*, 483 F.3d at 1237. Decisions of the United States Supreme Court, the Eleventh Circuit, and the Supreme Court of Florida can clearly establish law in this jurisdiction. *McClish*, 483 F.3d at 1237. For the law to be "clearly established," it must be so clear that every objectively reasonable official understands it to prohibit the challenged act. *See Vinyard*, 311 F.3d at 1353. The purpose of this requirement is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206.

> That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary. But in light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious. Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.

*Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003).

It is undisputed Pompee was a government official performing discretionary functions at the time of the conduct at issue. Therefore, the burden shifts to Cordoves to overcome the qualified immunity defense by demonstrating Pompee violated a clearly established statutory or constitutional right.

### 2. Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Ferraro*, 284 F.3d at 1197. In evaluating an excessive force claim under the Fourth Amendment, the court must inquire "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). The reasonableness analysis requires careful consideration of a number of factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Under Florida law, officers are permitted to make a full custodial arrest whether the offense is a felony or a misdemeanor. *See Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003) (citing FLA. STAT. § 901.15(1)). The Fourth Amendment permits law enforcement officers "to use some degree of physical coercion or threat thereof to effect" an arrest. *Graham*, 490 U.S. at 396. "[T]he use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." *Ferraro*, 284 F.3d at 1200. Therefore, "the application of *de minimis* force, without more, will not

support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). "[Q]ualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Ferraro*, 284 F.3d at 1200.

Courts have held a variety of behaviors reasonable in executing an arrest under circumstances similar to those presented here. For example, in *Croom v. Balkwill*, as officers stormed a house to execute a search warrant, they ordered an elderly woman seated in the front yard to "hit the ground." 645 F.3d 1240, 1245 (11th Cir. 2011). The woman told an officer near her she had arthritis and could not get down all the way, so she squatted instead. *See id.* The officer then pushed her to the ground and held her there with a foot on her back for ten minutes. *See id.* Despite the fact the woman was elderly and merely the occupant of a house subject to a search warrant, the Eleventh Circuit found the force the officer used, although perhaps not "truly necessary under the circumstances," was *de minimis.  Id.* at 1252.

In a similar case, *Jones v. City of Dothan, Alabama*, a man suspected of harassing and chasing a woman was confronted by police officers in a restaurant and "escorted . . . by his arm and belt" outside for questioning. 121 F.3d 1456, 1458 (11th Cir. 1997) (alteration added). The suspect asked the officers why they were doing this, telling them "he had not done anything wrong, had previously suffered a stroke, and was currently taking medication." *Id.* Once outside, however, the officers "'slammed' [the man] against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket. In the process, his pants were torn and the wallet contents were scattered on the ground." *Id.* (alteration added). The forced lifting of his arms caused the man pain due to his recent stroke, and the kicking gave him pain in his arthritic knees. *See id.* at 1460. The Eleventh Circuit held even though the use of force may have been unnecessary, it was nevertheless not excessive. *See id.* at

1460–61; *see also Nolin*, 207 F.3d at 1255 (grabbing the plaintiff from behind by his shoulder and wrists, throwing him against a van three or four feet away, kneeing him in the back, pushing his head into the side of the van, searching his groin area in an uncomfortable manner, and handcuffing him was not excessive force); *Durruthy*, 351 F.3d at 1085 (grabbing the plaintiff from behind, pulling him to the ground, struggling to pin his arms behind him, kneeing him in the back, and holding him down to handcuff him was not excessive force); *Woodruff v. City of Trussville*, 434 F. App'x 852, 853, 855 (11th Cir. 2011) (punching plaintiff in the face, forcefully removing him from his car, and slamming him onto the pavement, causing him to strike his head, was *de minimis* force); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (using taser gun to subdue and handcuff an uncooperative plaintiff was *de minimis* force); *Bryan v. Spillman*, 217 F. App'x 882, 886 (11th Cir. 2007) (pushing plaintiff against a car, holding his head against it, and conducting a "rough search" of his genitals was *de minimis* force).

The burden is on Cordoves to show Pompee used excessive force. Cordoves cites five cases in an attempt to meet this burden. (*See* Resp. 51–52, 54). In four of these cases, the critical fact making the officers' force excessive was that the plaintiffs were already arrested and secured, thus rendering the officers' application of force unnecessary. *See Ferraro*, 284 F.3d at 1199 ("Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose."). In *Ferraro*, the officer used excessive force because he took plaintiff "to the back of her car and slammed her head against the trunk *after* she was arrested and secured in handcuffs." 284 F.3d at 1198 (emphasis in original). In *Hadley v. Gutierrez*, the officer used excessive force when he "punched [plaintiff] in the stomach while he was handcuffed and not struggling or resisting." 526 F.3d 1324, 1330 (11th Cir. 2008) (alterations added). In *Slicker v. Jackson*, the officers used excessive force because, "after

[plaintiff] was handcuffed, the officers repeatedly hit his head on the pavement, kicked him, and knocked him unconscious." 215 F.3d 1225, 1233 (11th Cir. 2000) (alterations added). And in *Galvez v. Bruce*, the court found excessive force because, after the plaintiff was handcuffed, the officer "repeatedly slamm[ed] a fully secured and compliant [plaintiff] against the corner of a concrete wall, with force sufficient to break [his] ribs and cause a leaking aneurysm." 552 F.3d 1238, 1245 (11th Cir. 2008) (alterations added).

In the fifth case Cordoves cites, *Reese v. Herbert*, after finding no probable cause to arrest, the Eleventh Circuit found excessive force under a particularly brutal set of facts. *See* 527 F.3d 1253, 1273–74 (11th Cir. 2008). The officers first "slung [plaintiff] against a wall in a choke hold, struck him, and then threw him to the ground." *Id.* at 1273 (alteration added). Next, they piled on top of him, kicked him, and beat him while he lay face down. *See id.* The officers then "continued twisting his arm behind his back despite his repeated screams that they were breaking his arm." *Id.* Additionally, one officer "applied a pressure point technique on his neck," and another "pepper-sprayed [him] in the face" after his left arm had been handcuffed. *Id.* (alteration added). At no point did the plaintiff fight back or attempt to flee, and the only crime with which he was subsequently charged was nonviolently resisting arrest. *See id.*

### 3. Analysis

Although the Court accepts as true for purposes of summary judgment Cordoves's "version of what happened," *Draper*, 369 F.3d at 1272, the question under the excessive force analysis is "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer," *Vinyard*, 311 F.3d at 1347. Accordingly, the Court uses Cordoves's narrative to determine the facts confronting Pompee, and then the Court analyzes whether Pompee's conduct was objectively reasonable.

When Pompee initiated Cordoves's arrest,[7] he had been informed not only that she hit Caminero, but also that she disobeyed Caminero's order to leave the mall.  Knowing that, a reasonable officer could conclude Cordoves was a safety threat and was attempting to evade arrest.  The force Pompee thereafter employed in an attempt to subdue and handcuff Cordoves, including grabbing her arms, spinning her around, squeezing her, carrying her, slamming her into a wall, and then throwing her to the ground (after which he never touched her), fell within the ambit of force permitted by case law in the Eleventh Circuit.  *See* Part III.D.2, *supra*.  Perhaps some of it was unnecessary, but it was not excessive.  *See Croom*, 645 F.3d at 1252; *Jones*, 121 F.3d at 1460–61.

The burden, at any rate, is on Cordoves to show Pompee used excessive force.  In four of the cases Cordoves cites — *Ferraro*, *Hadley*, *Slicker*, and *Galvez* — the force was excessive because the plaintiffs had already been arrested and secured.  Cordoves, however, was never handcuffed, and it is not as if Pompee delayed in handcuffing her — as Cordoves admitted, "[e]verything happened very fast."  (Defs. SMF ¶ 79).  Additionally, Pompee's pre-arrest actions were not nearly as protracted or brutal as the actions of the officers in *Reese* who, in addition, were attempting to subdue a plaintiff later charged only with nonviolent resistance to arrest. Although Cordoves was charged with this crime as well, she was also charged with disorderly conduct, battery, and trespass.

Cordoves's Statement of Material Facts suggests certain facts should have alerted Pompee the force he was using was excessive.  As Pompee was squeezing Cordoves from behind, Cordoves got sweaty and pale, and she started to look like she was about to pass out. The Court, however, must assess the facts confronting Pompee, and it is entirely reasonable for an officer in his position to be unaware of the facial expressions of someone facing away from

---

[7] Cordoves does not dispute Pompee had probable cause to arrest her.

CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

him.  Further, Cordoves cites no case law supporting this argument, and in any event, that kind of physiological reaction could be expected in response to the application of lawful, *de minimis* force.   Also, during the struggle Cordoves told Pompee she was disabled, but the Eleventh Circuit has found *de minimis* force even when individuals told officers they recently had a stroke, *see Jones*, 121 F.3d at 1458, or had arthritis, *see Croom*, 645 F.3d at 1245.

Cordoves points out she fell unconscious while still pressed against the glass, which made it unnecessary to throw her to the ground.  But even if Pompee felt her body go limp, he could not see her face.   An officer in his position reasonably could have concluded not that Cordoves fell unconscious, but rather that she was feigning a fall to avoid being handcuffed or was even just slipping.  Finally, although Cordoves suffered physical and psychological injuries and even had to undergo surgery as a result of the incident, "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time."  *Rodriguez v. Farrell*, 280 F.3d 1341, 1353 (11th Cir. 2002) (alteration added). Viewing the evidence in the light most favorable to Cordoves, Pompee used *de minimis* force.

Assuming Pompee used excessive force, Cordoves has failed to show this was a clear violation of her constitutional rights.  "No particularized, preexisting case law" put Pompee on notice he was violating her rights, nor did his conduct go "so far beyond the hazy border between excessive and acceptable force that [he knows that he is] violating the Constitution."  *Reese*, 527 F.3d at 1274 (alteration in original; internal quotation marks and citation omitted).  Cordoves has not carried the burden of abrogating Pompee's qualified immunity, and therefore summary judgment on Cordoves's claim against Pompee is proper.

CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

### E.  Assault and Battery Claim

Cordoves seeks damages against the County for assault and battery on the theory the County is vicariously liable for Pompee's use of excessive force pursuant to section 768.28 of the Florida Statutes.  Under Florida law, a police officer conducting an arrest is liable for battery only if the force the officer used is clearly excessive.  *See Sanders*, 672 So. 2d at 47 (citing *Jennings v. City of Winter Park*, 250 So. 2d 900 (Fla. 4th DCA 1971); and RESTATEMENT (SECOND) OF TORTS § 132 cmt. a (1965)).  And because the right under the Florida Constitution to be free from unreasonable searches and seizures is construed in lockstep with the Fourth Amendment to the U.S. Constitution, *see* FLA. CONST. Art. 1, § 12; *Holland v. State*, 696 So. 2d 757, 759 (Fla. 1997), the "excessive force" analysis for a battery claim is identical to the "excessive force" analysis under the Fourth Amendment.  *See Sullivan v. City of Pembroke Pines*, 161 F. App'x 906, 911 (11th Cir. 2006) ("For the same reasons we concluded that the force used by Scopa was not clearly excessive under the law of this Circuit, we also conclude that it was not clearly excessive according to the similar standard set forth under Florida law."); *see also Sanchez v. Obando-Echeverry*, 716 F. Supp. 2d 1195, 1203 n.8 (S.D. Fla. 2010); *DaSilva v. Lamberti*, No. 08-62106-CIV, 2010 WL 680925, at *1 (S.D. Fla. Feb. 24, 2010).

Cordoves argues summary judgment should not be granted on her battery claim against the County because Pompee's use of force was clearly excessive.  (*See* Resp. 55–56).  The Court has already found, after construing the facts in the light most favorable to Cordoves, Pompee's use of force was not clearly excessive under the Fourth Amendment.  *See* Part III.D.3, *supra*. Cordoves's battery claim against the County is governed by the same analysis, and therefore summary judgment is proper as to the battery claim.

CASE NO. 14-20114-CIV-ALTONAGA/O'Sullivan

### F.  Concert-of-Action Claims

Finally, Cordoves claims Valor and Dadeland are liable under section 1983 for acting in concert with Pompee to deprive Cordoves of her constitutional rights.   Defendants argue summary judgment is proper as to these claims because Cordoves's constitutional rights were not violated.  (*See* Mot. 30).  Cordoves has not contested this argument, and because the Court has already found Pompee's use of force was not clearly excessive under the Fourth Amendment, *see* Part III.D.3, *supra*, summary judgment is proper as to these claims as well.

## IV.  CONCLUSION

Viewing the evidence in the light most favorable to Cordoves, the Court finds summary judgment is not proper on Counts III, IV, and V of the Third Amended Complaint.  Summary judgment is also not proper on Counts VI and VIII, except that Cordoves hereafter may not rely on an "intentional tort" theory of negligence.   Summary judgment is, however, proper on Counts I, II, and VII.  Accordingly, it is

**ORDERED AND ADJUDGED** that the Motion for Summary Judgment **[ECF No. 95]** is **GRANTED in part** and **DENIED in part** as stated herein.

**DONE AND ORDERED** in Miami, Florida, this 12th day of March, 2015.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record